UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

SHANE SKINNER and SAMANTHA SKINNER,

        Plaintiffs,

vs.

ARCH INSURANCE GROUP INC.,

        Defendant.

Case No. 24-cv-00003

---

# FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Shane Skinner and Samantha Skinner ("Plaintiffs" or "Class Representatives"), file this Class Action Complaint against Defendant ARCH Insurance Group Inc. ("ARCH" or "Defendant"), and allege:

## JURISDICTION and VENUE

1. Jurisdiction of this Court arises under 28 U.S.C. § 1332, based on the filings of the Defendant.

2. Venue in this Court is appropriate pursuant to the Class Action Fairness Act of 2005, Pub. L. 109-2, 119 Stat. 4 (2005) ("CAFA"), codified in various sections of Title 28 of the United States Code, including 28 U.S.C. §§ 1332(d) and 1453, based on the filings of the Defendant.

3. Under 28 U.S.C. § 1391(c), a defendant corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction. Defendant is subject to personal jurisdiction in Wisconsin, since they do business in Wisconsin.

## INTRODUCTION

4. This class action seeks injunctive and monetary relief to redress the unlawful travel insurance denial practices of ARCH.

5. The practices of ARCH affect hundreds or perhaps thousands of travel insurance customers. As more particularly described below, ARCH denied the Plaintiffs and other similarly situated consumers, proper coverage and reimbursement of their claims.

6. Southwest Airlines completely ceased operations as a result of a winter storm in late December of 2022 as set forth in the attached Southwest document; however, ARCH has refused to pay trip cancellation travel benefits to Southwest ticket holders with canceled flights because, according to ARCH only, the Southwest flight cancellations were not caused by inclement weather.

## PARTIES

7. Plaintiff Shane Skinner ("Plaintiff" or "Mr. Skinner") is a natural person who resides in the County of Milwaukee, State of Wisconsin.

8. Plaintiff Samantha Skinner ("Plaintiff" or "Mrs. Skinner") is a natural person who resides in the County of Milwaukee, State of Wisconsin.

9. Defendant ARCH Insurance Group Inc. ("ARCH" or "Defendant") is a business, with a principal office located at Harborside 3, 210 Hudson Street, Suite 300, Jersey City, NJ 07311. Defendant's registered agent is Corporation Service Company, 33 E. Main Street, Suite 610, Madison, WI 53703.

## FACTUAL ALLEGATIONS

10. In June of 2022, the Plaintiffs booked a holiday trip to Disney World, in Florida.

11. "In the final weeks of 2022, many travelers' holiday plans were disrupted by a winter storm that halted airline travel across the nation." Statement by Southwest Airlines, attached as Exhibit A.

12. Plaintiffs were impacted by this storm and their flights were cancelled.

13. Plaintiffs had purchased travel insurance from Defendant to prevent the economic impact of this issue: flight disruptions due to a winter storm.

14. Plaintiffs contacted Defendant and filed a claim for reimbursement.

15. Defendant has steadfastly denied the claim on the basis that the delays were not the result of inclement weather.

16. Defendant made said denials despite Southwest Airline's own public statements that these delays were in fact caused by inclement weather.

17. Defendant has denied the claims of all travel insurance customers that filed a claim for reimbursement due to the Southwest inclement weather disruption identified above.

## CLASS REPRESENTATION ALLEGATIONS

### *Statement of Maintainable Class Claims*

18. Pursuant to Wis. Stats. §803.08 and Fed. R. Civ. P. 23, this is a case maintainable on a class-wide basis and the Class Representatives bring this action on behalf of themselves and of a class of all other persons similarly situated, to remedy the ongoing unfair, unlawful, and/or deceptive business practices alleged herein, and seeks redress on behalf of all those persons who have been harmed thereby.

### *Allegations of Numerosity*

19.     Upon information and belief, Class Representatives believe more than 40 customers were affected by the unlawful activity of Defendant during the applicable statute of limitations.

20.     The prospective class numbers are so numerous that joinder of all members would be impractical. The exact size of the proposed classes and the identity of the members thereof are readily ascertainable from Defendant's business records.

### *Identification of Common Questions of Law or Fact*

21.     Pursuant to Wis. Stats. §803.08(1) and Fed. R. Civ. P. 23, there are questions of law and fact common to the Class, which common issues predominate over any issues involving owing individual class members.

22.     The factual question common to the Class Representative and each class member is relates to the denial of coverage by Defendant due to Winter Storm Elliott.

23.     Pursuant to Wis. Stats. §803.08 and Fed. R. Civ. P. 23, the principal legal questions common to the Class Representatives and to each member of the Class relate to the denial of travel insurance coverage.

### *Allegations of Typicality*

24.     Pursuant to Wis. Stats. §803.08 (1)(c) and Fed. R. Civ. P. 23, the Class Representatives' claims are typical of those of the classes they seek to represent in that the Class Representatives were denied travel insurance coverage. As such, the claims of the Class Representatives are identical to that of the class members. Plaintiffs reserve the right to modify the Class, add subclasses, and modify the class period as discovery is conducted.

### *Definition of Class*

25.     Pursuant to Wis. Stats. §803.08 and Fed. R. Civ. P. 23, the class is defined as:

4

> *All persons who, a) who purchased travel insurance from Defendant, b) had their travel plans adversely impacted by Winter Storm Elliott, c) filed a claim for reimbursement from Defendant, and d) were denied coverage by Defendant, within the one year preceding this case through the date of class certification, e) and who have not filed for relief under the United States Bankruptcy Code.*

### *Adequacy of Class Representative*

26. Pursuant to Wis. Stats. §803.08 (1)(d) and Fed. R. Civ. P. 23, the Class Representatives will fairly and adequately protect and represent the interest of each class member. The Class Representatives have retained counsel with experience in handling class actions in federal and state court.

27. Counsel for the Class Representatives has no conflicts of interest which would interfere with his ability to represent the interests of the class members.

### *Appropriateness of Class Treatment*

28. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members may be relatively small compared to the expense and burden of litigation, it would be impractical and economically unfeasible for class members to seek redress individually. The prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications with respect to the individual class members against Defendant.

29. Members of the proposed class who have an interest in individually controlling the prosecution of separate claims against Defendant will not be prejudiced by this action. Each

member of the proposed classes will be identified through discovery from Defendant and will be notified and given an opportunity to opt out of their respective class(es).

30. The Class Representative does not presently know the nature and extent of any pending litigation to which a member of the proposed classes is a party and in which any question of law or fact controverted in the present action is to be adjudicated. The Class Representative will identify any such pending litigation by discovery from Defendant.

31. This Court is an appropriate forum for the present action in that Defendant entered into a contract with Plaintiffs in this county and Defendant does business in this county.

32. Certification of a class under Wis. Stats. §803.08(2)(b) and Fed. R. Civ. P. 23 is appropriate as Defendant has acted on grounds generally applicable to the Class with respect to the activity described above thereby making appropriate equitable relief with respect to the Class as a whole. Unless restrained from such activities, Defendant will continue to unlawfully harm the interests of the Class Representatives and the class for which no adequate remedy at law exists.

33. Certification of a class under Wis. Stats. §803.08(2)(c) and Fed. R. Civ. P. 23 is also appropriate in that:

> (a) The questions of law or fact common to the members of the class predominate over any questions affecting an individual class member; and
>
> (b) A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

34. The Class Representatives request certification of a class for monetary damages and declaratory relief under Wis. Stats 803.08(2)(c), and Fed. R. Civ. P. 23, and

6

35. There are no difficulties likely to be encountered by the Court in the management of this proposed class action.

36. The Class Representatives' counsel is entitled to a reasonable fee from the class members or from a common fund for the prosecution of this action.

**FIRST CAUSE OF ACTION – BREACH OF CONTRACT**

37. Plaintiffs re-allege the above paragraphs as if fully set forth herein.

38. The policy was and is a valid and binding contract between the parties. The Skinners and the putative class have substantially complied with all policy terms and conditions with respect to the underlying insurance claim.

39. Despite their cooperation and compliance, Defendant and/or its authorized agents have breached the policy by failing to, among other things:

    a. Properly and timely adjust the claim;

    b. Conduct a diligent investigation;

    c. Relay accurate information concerning the terms and conditions of the policy;

    d. Issue timely payment of the underlying insurance claim in an appropriate amount to cover the losses claimed;

    e. Assist the Skinners and putative classes' efforts to obtain timely payment of the underlying insurance claim;

    f. Acknowledge and indemnify the Skinners and the putative class for all damage arising out of the covered loss described above;

    g. Cure its breach of the policy despite the Skinners' and putative classes demands; and

h. Any other acts or omissions to be shown at trial on the merits.

40. As a direct and proximate result of Defendants breach(es) of the policy and Wisconsin laws governing the insurance industry, the Skinners and putative class have suffered and will continue to suffer damages, including, but not limited to, those described in this complaint. Plaintiff seeks its actual damages and losses, along with reasonable attorney's fees and costs for this claim.

## SECOND CAUSE OF ACTION – BAD FAITH

41. Plaintiffs re-allege the above paragraphs as if fully set forth herein.

42. By virtue of the policy issued by Defendants to the Plaintiffs and putative class, Defendant owed certain express and implied duties to the Plaintiffs and putative class, including, but not limited to:

      a. A duty of good faith and fair dealing;

      b. A duty to act in the insured's best interests;

      c. A duty to promptly acknowledge communications with respect to claims;

      d. A duty to promptly perform claim investigation services;

      e. A duty to provide necessary information and instructions to the insured for compliance and submission of claims;

      f. A duty to attempt in good faith to effectuate a fair and equitable settlement of claims;

      g. A duty to provide prompt and reasonable explanation of the basis in the policy or applicable law for any delay or denial of benefits;

      h. A duty to refrain from requiring the insured to initiate a lawsuit to recover amounts due and owing under the policy;

  i. A duty to promptly pay any undisputed or irrefutable loss in a timely fashion; and

  j. A duty to promptly represent the terms and conditions of the policy.

43. Defendant and/or its authorized agents breached the terms and conditions of the policy and duties owed to the Plaintiffs and putative class by failing or refusing to acknowledge the covered loss and make payments for those damages in a timely fashion.

44. Defendant has breached the implied covenant of good faith and fair dealing by, among other things, intentionally or recklessly disregarding evidence to support the underlying insurance claim and resolving uncertainties against its insureds in order to deny coverage.

45. Defendant failed to proceed on the Plaintiffs' and putative classes subject insurance claim in a manner that is honest and informed and has acted in bad faith.

46. As a direct and proximate result of Defendants' bad faith, the Plaintiffs and putative class are entitled to recover all losses due and owing under the policy, all other compensatory and pecuniary losses, attorney fees and costs, and punitive damages, all in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendant as follows:

  A. For an order certifying this claim as a class action, with the Plaintiff's as class representatives and the undersigned as class counsel;

  B. For payment of any unpaid portion of the claim as a result of damage as described in this complaint;

  C. Declaratory relief related to the insurance policy coverage;

D.  For all other damages sustained by Plaintiffs as a result of Defendant's breach of the insurance policy;

E.  For all other contractual or other benefits due and owing under the policy;

F.  For litigation and investigation costs, including reasonable attorney fees;

G.  For punitive damages; and

H.  For all other relief this Court deems just and proper, including the costs and disbursements of this proceeding.

## **DEMAND FOR JURY TRIAL**

Plaintiffs Shane Skinner and Samantha Skinner, demand a trial by jury of all issues so triable.

Dated: January 9, 2024.

DeLadurantey Law Office, LLC

By: */s/Nathan E. DeLadurantey*
Attorney I.D.#1063937
330 S. Executive Drive, Suite 109
Brookfield, Wisconsin 53005
Telephone: (414) 377-0515
Nathan@dela-law.com
*Attorney for the Plaintiffs*



# Final Summary and Action Plan

©2023 Southwest Airlines Co.

## Introduction: Event Recap

In the final weeks of 2022, many travelers' holiday plans were disrupted by a winter storm that halted airline travel across the nation. Days of disruption from a weather event that affected all carriers became a winter preparedness and Crew Network event unique to Southwest Airlines. As a result, we let down both our Customers—and our People who heroically serve them.

Winter Storm Elliott was epic in scale, velocity, and duration. The result, over several days, was cascading and close-in flight cancellations in unprecedented numbers. It exceeded our ability to quickly and efficiently reschedule the airline, especially our Flight Crews. These scheduling issues led to further flight cancellations until we were able to reset the airline. While we were, and remain, well-prepared for winter weather throughout our nationwide system, the severity and magnitude of the storm was more sudden and severe than had been predicted and, thus, had a greater impact on our airport operations than planned.

Following these events, we conducted a thorough internal review, working with our Board of Directors, and engaged respected aviation consultancy Oliver Wyman for a third-party assessment. It has taken many weeks of work to sort through the complexity of contributing factors. Now, the root causes and lessons learned are guiding our efforts to make Southwest better prepared to handle truly extreme winter weather events as we move forward.

To mitigate the risk of future disruptions, we are investing in additional capabilities across the airline. Our actions will address everything from ground equipment to the volume of aircraft de-icing we can accomplish in the harshest conditions. We are improving how we communicate and align across multiple operational workgroups during disruptions, including strengthening our interconnected scheduling and operations systems so they function effectively in extreme circumstances. And we are making organizational changes to improve coordination among key divisions of the airline. Finally, we're reprioritizing and increasing investment in technology. In fact, we have $1.3 billion budgeted for technology projects in 2023, which is about 25% higher than what we spent in 2019.

We hope these actions bring our Customers and our People trust and confidence in our approach to eliminate a repeat event. Southwest is a Company with more than five decades of success built around operational reliability, high-quality Customer Service, and legendary Hospitality—with our Customers, Employees, and the communities we serve.

## Immediate Event Response

To reset the network and reunite available Flight Crews with aircraft, we significantly reduced the flight network to about 1,500 daily departures (from a holiday peak of ~4,000 a day) for a few days starting on Dec. 27, 2022. While resetting the schedule, Operational Teams coordinated ferrying aircraft to reposition the planes and to get available, and scheduled, Crews in places to resume a normal-sized operation on Dec. 30, 2022.

During the disruption, we worked proactively to communicate both to Customers and to Employees regarding the status of our operation, to share where Customers could go for assistance with re-accommodations, and to preview how we would recover our network operation. Simultaneously, our Government Affairs Team worked to keep both elected officials and regulatory agencies apprised of our plans to take care of our Customers and Employees.

With nearly two million Customers disrupted, we launched simultaneous and significant efforts to process and return luggage to travelers; receive and process requests for ticket refunds; and to receive, review, and process expense reimbursement requests. Among our immediate priorities was reuniting nearly 100,000 pieces of luggage with travelers whose trips had been canceled. Our internal Technology Team designed and deployed a QR code and online form to assist Customers with submitting bag claims which helped us ide

We identified, trained, and equipped hundreds of Employees who volunteered to assist in the effort to help Customers. Automation was designed and deployed quickly to help speed-up processing of refund requests to meet our commitments and to keep us within federal timeline requirements for issuing refunds.

## Customer Recovery



| Refunds | Reimbursements | Bags |
|---|---|---|
| >99% Refund requests processed | >99% Reimbursement requests processed | >99% Bags delivered or have a delivery plan with the Customer *Remaining bags are fewer than 100 and are either unclaimed or have no identification |

Additionally, we issued impacted travelers a note of apology from our President and CEO, along with 25,000 points in our Rapid Rewards frequent flyer program, as a gesture of goodwill. Through late March 2023, nearly half of the impacted travelers either already have flown or have made a future booking with Southwest, and we are grateful for this indication of ongoing Customer loyalty.

To our Employees, true heroes throughout this operational disruption, our President and CEO sent a note to update them on progress for making things right with our Customers, and to brief them on the status of internal reviews. This outreach included a gesture of goodwill for 25,000 points in the Company's internal Southwest Airlines Gratitude (SWAG) incentive program. The program allows participating Employees to redeem points for merchandise, gift cards, and other items.

## Winter Storm Elliott High Level Timeline
As operations stabilized, Teams transitioned from a focus on operational recovery into Customer recovery



Timeline:
- 12/21 Initial impacts of Winter Storm Elliott
- 12/22 Mass cancellations begin
- 12/30 Operational schedule restored
- 1/1 Refund & Reimbursement work begins
- 1/3–1/5 Customer Apology Email
- 1/9 Employee Apology Email
- 1/16 Email to RR Members & Corporate Travel Managers

Southwest stands apart from other air carriers with our Customer-friendly offerings such as being the only major U.S. airline that allows all Customers to check two bags for free (size and weight limits apply, of course) and has no expiration date for Customer flight credits (as long as the flight is canceled more than 10 minutes prior to the scheduled departure). Additionally, Southwest is long known for never charging fees when Customers change or cancel a flight, and Rapid Rewards Points never expire*. For Employees, Southwest is known for its legendary Culture and its unprecedented record of no involuntary furloughs or layoffs in its history. All of these elements are important to helping us rebuild relationships with those we let down.

## Immediate Preventative Actions Taken

Southwest is committed to doing all we can to mitigate the risk of a repeat operational disruption on the magnitude of what happened in December 2022. Among the immediate preventative actions taken early in 2023:

- We identified and trained a group of Employees to provide **surge staffing** during extreme weather events to assist Crew Scheduling. These Employees can be quickly mobilized by a new notification process.
- We established a set of performance criteria in the form of an **upgraded leading-indicator dashboard** that will help Operational Teams evaluate things like worsening conditions and impending close-in flight cancelations to determine when to escalate an operational situation.
- Our vendor, which provides many airlines with their Crew optimization software, has already developed and provided a new solution to help us and other airlines to more efficiently work through a backlog of broken Crew schedules from flight cancellations. We have deployed Crew **Optimization software upgrade** and are developing a playbook regarding how and when to access solutions that the tool provides.
- We will continue to add to our existing tools for Crew Member **electronic communication to Crew Scheduling** during irregular operations.
- We also implemented **organizational changes** designed to improve coordination and communication between the Network Operations Control (NOC), Network Planning, and Crew Scheduling Teams.
- We began **internal reviews** to assess our readiness and capacity to manage severe winter operations, prioritizing Employee Safety during extreme or extended winter operations. This work will include evaluating new tools and equipment and exploring process improvements.
- We engaged Oliver Wyman, a noted consultancy with vast experience in aviation operations, to work with the Company to conduct a **third-party assessment** of the disruption and make recommendations on an action plan. The assessment included a deep dive into the disruption and more than 50 interviews with Union Representatives and Employees from Technology, Network Operations Control, and Crew Scheduling. Additionally, the assessment included visits to key airport locations, and a review of performance data and current-state processes and procedures.
- The Southwest Board of Directors created an Operations Review Committee to oversee management's review of the disruption and action planning.

## Review Process and Key Findings

As soon as the operation was stabilized, internal working Teams began a department-by-department review of procedures, tools, processes, and playbooks. Our internal review along with the Oliver Wyman assessment were used to determine the key root causes of the event, lessons learned, and an action plan for the airline to follow.

## Key Root Causes

- **Winter Operations:** We had insufficient winter infrastructure and equipment in key airport locations and faced staffing challenges from the need to rotate Employees outside in bitter winter weather conditions. These issues hindered our ability to keep our Flight Crew networks flowing from key Crew bases.
- **Cancellation Waves:** The pace and volume of close-in cancellations forced our aircraft and Crew Scheduling teams to rely on time-consuming manual processes that could not keep pace with the volume of individual scheduling issues.
- **Cross-Team Collaboration:** Compartmentalized communications and gaps in our process between important operational workgroups resulted in bottlenecks.

## ACTION PLAN
## Improve Winter Operations
*(Infrastructure, equipment and winter preparedness)*

In cities where severe weather can inhibit our operations and aircraft throughput, we are working to make critical equipment and infrastructure available in ample supply.

- **Deicing Trucks and Deicing Pads Increase**
    - Purchased additional trucks and adding "closed cab" trucks to use in extreme weather conditions
    - Securing additional deicing pads in Dallas, Denver, Chicago Midway, and Nashville to increase the volume of aircraft that can be deiced at any given time

- **Deicing Fluid Reserves Assessment**
  - Conducting inventory of existing deicing fluid (glycol) capacity and will work to increase glycol storage capacity
- **Ground Equipment Assessment**
  - Reviewing ground support equipment in airports with regular sub-zero temperatures to evaluate management of fuel during winter operations
  - Evaluating ramp cleaning procedures to keep surfaces free of precipitation to the maximum extent possible
- **New Weather Application**
  - Implementing new weather application to better gauge dynamic local weather conditions and determine liquid water equivalents to help Pilots know how much time they have to depart after an aircraft has been deiced
- **More Engine Covers and Heaters**
  - Purchasing 200 additional engine inlet covers to protect engines and fan blades from icing and extreme temperatures, along with 16 additional field-use heaters to deter ground equipment from freezing in low overnight temperatures
- **Winter Staffing Level Checks**
  - While we were fully staffed during the disruption, we are reassessing our winter staffing model to augment additional personnel at airports where deicing and rotating Ground Operations Employees are regular, seasonal occurrences due to extreme cold

## Enhancing Cross-Team Collaboration
*(Processes, decisions and communication)*

As the events of late December evolved from winter storm management into an operational crisis, objective criteria to escalate our response emerged as a need for Southwest.

- **Network Planning and Network Operational Control (NOC) Organizational Alignment**
  - Implemented organizational change to align Network Planning (the function that plans the flight/route network) with Network Operations Control (the function responsible for executing the daily schedule/operation) under the same Senior Leader for increased operational efficiency
- **Alerting and Decision-Support Tools Refresh**
  - Updated the leading indicators dashboard with more objective escalation criteria
  - Enhanced alerting capabilities, documented escalation procedures, and established clear lines of communication among several operating groups to ensure solutions are explored collaboratively and with understanding of the connected impact of workgroup decisions
- **Aircraft and Crew Recovery Coordination**
  - Upgrading network health dashboards to support the Network Operations Control, station command centers, and Crew Scheduling situational awareness and network visibility into performance data and operational status
  - Creating a common escalation language and agreement on throughput capacity at airport locations being affected by extreme weather

## Accelerating Other Operational Investments
*(Technology and tools for greater volume and pace)*

Additional enhancements are planned based on Southwest's assessments.

- **Crew Optimization Software Upgrade**
  - Developed an upgrade that was tested and deployed to help Crew Schedulers with re-accommodation solutions in future irregular operations lessening the need to resort to manual processes
- **Crew Notification Enhancements**
  - Enhancing electronic Crew notification and acknowledgement system and upgrading Crew phone system
- **Customer Support & Services Phone System Stability**
  - Upgrading Customer communication tools with additional phone capacity to amplify services during surge periods
- **System Recovery Function Enhancements**
  - Strengthen alignment between recovery tools to improve time to implement solutions during extreme weather events

## Our Ongoing Commitment

There's a saying that character is revealed by what a person says and what a person does. Same goes for a company. We know we have work to do to repair confidence in those whose travel plans were disrupted, and we are off to a great start in 2023 – holding the #2 spot in on-time performance year-to-date through March.

Simply put, we have a nearly 52-year history of serving our Customers, Employees, and communities safely and with LUV. We will not allow a week in December to define us, but we will continue to learn from what happened and be better because of it.

# Action Plans:
## Improving Winter Operations

Updated as of July 26, 2023

| | Completed | On track for Winter 2023 |
|---|---|---|
| Deicing Trucks and Deicing Pads Increase | | ✓ |
| Deicing Fluid Reserves Assessment | | ✓ |
| Ground Equipment Assessment | | ✓ |
| New Weather Application | | ✓ |
| More Engine Covers and Heaters | ✓ | |
| Winter Staffing Level Checks | | ✓ |

## Accelerating Operational Investments

| | Completed | On track for Winter 2023 |
|---|---|---|
| Crew Optimization Software Upgrade | ✓ | |
| Crew Notification Enhancements | | ✓ |
| Customer Support & Services Phone System Stability | ✓ | |
| System Recovery Function Enhancements | | ✓ |

## Enhancing Cross-Team Collaboration

| | Completed | On track for Winter 2023 |
|---|---|---|
| Network Planning and Network Operational Control (NOC) Organizational Alignment | ✓ | |
| Alerting and Decision-Support Tools Refresh | ✓ | |
| Aircraft and Crew Recovery Coordination | | ✓ |